CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorney

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3701
FAX: (510) 637-3724
Kelly.volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARLON DERRICK SALTER,<br><br>Defendant. | CASE NO. 4:26-cr-00133-AMO<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: September 28, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Araceli Martínez-Olguín |

## INTRODUCTION

On February 16, 2026, defendant Marlon Derrick Salter, a convicted felon with considerable criminal history—including two prior federal convictions for assault with a firearm on a person—possessed a Taurus PT24-7 .40 caliber handgun loaded with 11 rounds of ammunition. Specifically, while plain clothes Oakland Police Department (OPD) officers were on patrol in a high-crime area, OPD officers observed hand-to-hand drug sales occurring through a window of a green van, and also observed Salter approach a vehicle, look inside, and confront the occupant. It appeared that Salter was providing protection for the drug sales. When uniformed OPD officers arrived, Salter left in his truck and, upon being detained, was found with the loaded firearm in his vehicle and a substantial amount of individually-wrapped drugs on his person.

As part of a violent crime reduction initiative in Oakland, Salter was charged with and ultimately pleaded guilty to being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

For the reasons set forth below, the government requests that the Court sentence Salter to 26 months of imprisonment, a three-year term of supervised release (with the conditions recommended by probation and set forth in the plea agreement), a $100 special assessment, and order forfeiture of the firearm, ammunition, and other items seized.

## BACKGROUND

### I. The Illegal Possession of Firearms Poses an Unacceptable Danger to Oakland and Surrounding Communities

The relevant conduct in this case is described below but the defendant's conduct in this case did not occur in a vacuum. Rather Salter's illegal possession of a firearm helps to fuel the wave of gun violence that is and has been ravaging Oakland. The proliferation of illegal firearms amplifies the issue of violent crime, as robberies, burglaries, domestic violence incidents, or even routine altercations like road rage incidents, carry the potential to become deadly when the participants are armed. Illegal firearms are also central to the challenge of gang violence, with groups of young armed people too often turning residential neighborhoods into combat zones. Although the rate of shootings has fallen from its peak in 2023, the number of shootings and gun-related murders remains unacceptably high.

Harrowing statistics underscore the damage illegal firearms inflict on Oakland. In 2025, the city suffered 67 homicides, at a rate of 15 homicides per 100k residents. This homicide rate is *five times* the rate of San Francisco, and also substantially higher than neighboring cities in Berkeley and San Leandro.



| City | 2025 Population | Homicides 2025 | Homicides (per 100k) |
|---|---|---|---|
| *Oakland* | *444,196* | *67* | *15* |
| San Francisco | 826,079 | 28 | 3 |
| Los Angeles | 3,874,000 | 230 | 6 |
| Berkeley | 123,195 | 1 | 0.8 |
| San Leandro | 86,587 | 3 | 3.5 |
| San Jose | 993,000 | 24 | 2.4 |

It is not a mystery why Oakland has suffered so many more homicides than its neighbors. It is because of illegal firearms. Of the 67 homicides in 2025, 65 of them were committed with a firearm, and only 2 involved some other means. Indeed, as part of the violent crime reduction initiative, one of the other defendants charged—not Salter—had engaged in a shootout in a crowded downtown Oakland nightclub in the early morning of March 7, 2026, in which two people were killed—including a schoolteacher who was shot as she attempted to run from the gunfire—and at least five others also suffered gunshot wounds during the incident. *See United States v. Jarvis Toussaint*, Case No. 4:26-cr-00235-JSW, Dkt. 1.

And the problem is not limited to murders. There were 350 individuals who were shot in 2025, many suffering gruesome injuries with lifelong impacts. 2025 also saw 1,674 robberies and 2,950 aggravated assaults in 2025. As with homicides, Oakland suffers robbery and aggravated assaults at a much higher rate when compared with its neighbors. And a substantial portion of these violent crimes also involved firearms. Indeed, these violent confrontations, when mixed with illegally possessed firearms, all too often escalate into a shooting or a murder.

Nor has the problem abated in 2026. Through only the first quarter of 2026, Oakland had already suffered 13 homicides, 374 robberies (102 involving firearms), 588 aggravated assaults, and 53 assaults with a firearm (including shootings and injuries by firearms). These statistics are staggering.

This is also not a problem that is limited to people already involved in criminal activity. Every resident of Oakland is made less safe by these illegal guns. Innocent bystanders uninvolved in criminal activity have been maimed and killed. For example, in 2021, an almost two-year old boy was shot and killed in his car seat in his family vehicle when gang members engaged in a shootout on I-880 in

Oakland. And, as described above, in March 2026, an innocent 33-year-old middle school teacher was murdered at a mass shooting at a night club in Oakland. Another defendant (not Salter) charged in the violent crime reduction initiative—*Operation Disarm*—is charged with illegally possessing a gun that was involved in a shooting in a parking lot near two schools in Oakland.[1]

These tragedies and grim statistics are astounding, and they are unacceptable. Oakland has suffered enough. The proliferation of illegal firearms is not a trivial matter, but a direct threat to the safety of the community. Salter's offense, particularly where he was protecting ongoing drug sales and willing to confront an individual nearby while illegally possessing a firearm, is grave and must be set against this context of a culture of violence in Oakland that must be disrupted.

## II. Offense Conduct

On February 16, 2026, Oakland Police Department (OPD) officers were patrolling near 57th Avenue and Foothill Boulevard in Oakland, California, due to recent criminal activity occurring in the area that included shootings, robberies, carjackings, illegal firearms, and narcotics sales. Presentence Investigation Report ("PSR") ¶ 6. OPD observed a Green Nissan Quest Van with fully tinted windows parked in a red zone. *See id.* OPD observed several hand-to-hand transactions, suspected to be drug sales, out of one of the rear windows of the green van. *Id.* OPD also saw a male later identified as Salter loitering in the area, potentially offering protection for the drug sales. *Id.*

At one point, Salter approached a vehicle and confronted the occupant, then yelled back toward the green van. PSR ¶ 6. Uniformed OPD officers arrived, and Salter quickly walked away toward a Black Ram Truck. PSR ¶¶ 7–8. OPD subsequently learned that Salter's girlfriend was in the green van with individually wrapped bags containing various narcotics, including suspected crystal methamphetamine, suspected black tar heroin, suspected powder cocaine, as well as more than $2,200 in U.S. currency. PSR ¶ 7.

Uniformed OPD officers followed Salter in his Black Ram Truck and ultimately effectuated a traffic stop to detain him. PSR ¶ 8. OPD observed a firearm in the center console of the truck, and placed Salter under arrest. *Id.* Specifically, OPD found a Taurus PT24-7 .40 caliber handgun loaded

[1] https://www.justice.gov/usao-ndca/pr/arrests-seizures-and-federal-firearms-charges-surge-oakland-through-coordinated.

with 11 rounds of ammunition, and one round in the chamber. *Id.* Also, in searching Salter's person, OPD found large quantities of individually-wrapped narcotics, including 175 individual twists with crack cocaine, 30 individual twists of powder heroin, 30 individual twists of black tar heroin, and 44 individual twists of powder cocaine. *Id.*; Dkt. 20 ¶ 2.

A record check reported that the Taurus PT24-7 .40 caliber handgun had previously been reported stolen. PSR ¶ 8. The firearm was manufactured in Brazil and imported through Miami, Florida, and it is capable of accepting a high capacity magazine. *Id.*

Salter was a felon prohibited from possessing a firearm or ammunition at the time of the incident. PSR ¶ 29.

**III. Criminal History**

Defendant has suffered the following convictions as an adult (PSR ¶¶ 26–30):

- 1994: California Penal Code § 245(a)(2) — Assault with Firearm on a Person;

Note that Salter was originally sentenced to 3 years' probation but had that revoked five times, incurring additional custodial sentences of 9 months and 2 years', as well multiple parole violations. *See* PSR ¶ 26.

- 1998: California Penal Code § 243(d) — Battery with Serious Bodily Injury;
- 2001: California Penal Code § 215 — Fight / Challenge in Public Place;
- 2004: California Penal Code § 245(a)(2) — Assault with Firearm on a Person;

Note that Salter was sentenced to 10 years in prison.

- 2014: California Vehicle Code § 23152(a) — Driving Under the Influence of Alcohol.

In addition to the above convictions, Salter was discovered by law enforcement in 1996 ditching a .32 caliber revolver that was determined to be stolen. PSR ¶ 32. Salter has four other arrests for firearms-related and narcotics-related offenses. PSR ¶¶ 34–37.

Salter's criminal history score is three, and his Criminal History Category is II. PSR ¶ 31; *see also* Dkt. 20 ¶ 7.

**IV. Procedural Posture**

On March 26, 2026, a federal grand jury charged Salter via Indictment with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. On

April 3, 2026, Salter waived his right to a contested detention hearing and findings and, but for a temporary release to attend a funeral, Salter has remained in continuous federal custody since April 7, 2026. PSR ¶ 4.

On June 1, 2026, pursuant to a plea agreement, Salter pleaded guilty to the charge against him. Dkt. 20. The government agreed to recommend a sentence of no more than 26 months of imprisonment. Dkt. 20 ¶ 15.

## ARGUMENT

### I. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include (among other factors):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### II. Sentencing Guidelines Calculation

As set forth in the PSR and the plea agreement, the Sentencing Guidelines calculations for Defendants offense level is as follows:

//

//

| | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base offense level | § 2K2.1(a)(4) – prohibited person in possession of firearms or ammunition + firearm capable of accepting high capacity magazine | 20 |
| Specific offense characteristics<br>Stolen firearm<br><br>Possessed firearm in connection with another felony offense | | <br>+2<br><br>+4 |
| Acceptance of responsibility | § 3E1.1(a) | -3 |
| Total offense level | | 23 |

PSR ¶¶ 12–23.

The Probation Officer concluded that Salter's criminal history score is three, and his Criminal History Category is II. PSR ¶ 31. The parties agree that Salter is a Criminal History Category II. *See also* Dkt. 20 ¶ 7. As reflected in the PSR, the Guidelines range for imprisonment associated with adjusted offense level 23 and Criminal History Category II is 51–63 months of incarceration. PSR ¶ 64. The Probation Officer recommends a 36-month sentence. *Id.* at Sentencing Recommendation. Because the guideline range falls into Zone D of the Sentencing Table, the minimum term must be satisfied by a sentence of imprisonment. *Id.* ¶ 64; U.S.S.G. § 5C1.1(f).

The parties jointly recommend a sentence of 26 months of imprisonment. *See* Dkt. 20 ¶ 15; Dkt. 27.

**III. The United States' Sentencing Recommendation**

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a custodial sentence of 26 months' imprisonment, to be followed by a three-year term of supervised release. *See* Dkt. 20 ¶ 15. This sentence accounts for a 50% reduction or downward variance from the advisory Guideline range, in exchange for speedy resolution within approximately six months of charging. *Id.* Consistent with 18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense and to provide deterrence, but also to account for relevant mitigating factors.

As discussed above, gun violence has plagued Oakland for far too long. In an effort to tackle this problem, beginning in March 2026, federal and local law enforcement coordinated efforts in a surge of federal firearm enforcement measures in Oakland and the East Bay that resulted in the seizure of 76 illegally possessed firearms and charges against 51 defendants.[2] Salter is one of those defendants. Salter possessed a loaded gun in a public place while protecting drug sales—and possessing distribution-quantity drugs himself—and, upon seeing OPD officers, fled and tried to evade detection. The government's recommended sentence in this case therefore plays a key role in its efforts to disrupt the cycle of gun violence in the East Bay by deterring Salter from possessing dangerous guns once released, and others like Salter who continue to threaten the safety of the East Bay community by illegally possessing firearms. A meaningful sentence in this case, which would mark the first time Salter has been in federal custody or on federal supervision, is necessary to deter Salter. This, in turn, reflects the need for the sentence to promote respect for the law and afford general deterrence. *See* U.S.S.G. § 3553(a)(1), (a)(2)(A)–(B).

In addition, for characteristics of the defendant, specific deterrence, and to protect the public from further crimes of the defendant, it is notable that Salter has previously been convicted of two felony convictions for assault with a deadly weapon, namely a firearm, on a person, as well as battery on a person. *See* PSR ¶¶ 26–29. Those prior convictions and sentences did not deter him from again possessing a firearm and ammunition. A significant sentence in this case followed by three years of supervised release will hopefully put an end to Salter's possession of illegal firearms.

On the other hand, some sentencing factors support a more lenient sentence. The history and characteristics of Salter, for example, support a more lenient sentence. It appears that as a child Salter, who was born and raised in the East Bay, had to confront the very cycle of violence that this case and others like it aim to upset. *See* PSR ¶¶ 39–43. He has also reportedly struggled from an early age with substance abuse involving a variety of drugs, including alcohol, cocaine, and heroin. PSR ¶ 52. Salter's sister is a social worker in the East Bay and provided a moving statement of the work Salter has done more recently to try to give back to his community. PSR ¶ 44.

---

[2] https://www.justice.gov/usao-ndca/pr/arrests-seizures-and-federal-firearms-charges-surge-oakland-through-coordinated.

Also in Salter's favor is that after his arrest, he took early and full responsibility for his criminal misconduct. It is through Salter's early and fulsome acceptance of responsibility that he stands before the Court almost exactly six months from the initial charges filed against him. The government is optimistic that this case will serve as an inflection point for Salter. He is now 50 years old. As demonstrated by his sister's letter, there are members of the community that rely on him. *See* PSR ¶ 44. He cannot continue to engage in behavior that threatens the public and that will result in his continued incarceration. Rather than being a threat to the community, the government is hopeful that its recommended sentence, which includes three years of supervised release after his prison term, will be the impetus for Salter to transform himself into a productive member of the community.

**CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence Salter to 26 months in prison followed by a three-year term of supervised release.

DATED: September 21, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelly I. Volkar*
KELLY I. VOLKAR
Assistant United States Attorney